# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ILLINOIS.

(No. 13475.—Judgment affirmed.)

THE SESSER COAL COMPANY, Plaintiff in Error, *vs.* THE IN-
DUSTRIAL COMMISSION *et al.*—(KEZIA OGILVIE, Admx.
Defendant in Error.)

*Opinion filed December 21, 1920—Rehearing denied Feb. 3, 1921.*

1. WORKMEN'S COMPENSATION—*what is sufficient proof that the
death of mine examiner was accidental.* Proof that a mine exam-
iner was found dead lying across the track in front of an electric
motor on which he had been riding when returning to the shaft
from his work in a certain part of the mine; that his head was
in contact with the motor and the rail; that the power was on and
that when the power was shut off the motor backed down-grade
away from the body, is sufficient to sustain a finding that the death
was the result of an accident.

2. SAME—*when compensation will not be denied because of vio-
lation of rule of employer.* Compensation for the death of a mine ·
examiner, who was found lying across the track in front of a mo-
tor on which he had been riding when returning to the shaft from
his work in the mine, will not be denied on the ground that his
death was the result of a violation of a rule that the examiners
were not to use the motors, where the evidence shows that the rule
was not enforced and that the examiners did use the· motors with
the knowledge of the employer.

*3.* SAME—*it is desirable that respondent file a reply to petition for writ of error.* In order that the Supreme Court may act advisedly upon a petition for a writ of error in a compensation case it is desirable that the respondent file a reply to the petition, and an additional abstract if necessary, before the petition is acted upon.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. CHARLES H. MILLER, Judge, presiding.

A. B. MANION, for plaintiff in error.

A. W. KERR, J. B. LEWIS, and A. C. LEWIS, for defendant in error.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

John Ogilvie, an extra examiner and gas brusher employed by the Sesser Coal Company, plaintiff in error, was killed while riding on and operating an electric motor in the mine of plaintiff in error at about five o'clock on January 29, 1918, and his widow, as administratrix of his estate, applied to the Industrial Commission for compensation for his death. It was stipulated that if her claim was good she was entitled to the maximum of $4000, and the claim was sustained by the arbitrator. On a review by the Industrial Commission the testimony of a doctor at the inquest was read into the record by stipulation and the decision of the arbitrator was confirmed. On a writ of *certiorari* from the circuit court of Franklin county the application was remanded to the Industrial Commission, with instructions to take further evidence on the question of the cause of death. Further evidence was taken in pursuance of the remanding order and the award of the arbitrator was again confirmed. The cause again coming before the circuit court on a writ of *certiorari*, judgment was entered confirming the award. This court, upon consideration of a petition containing a partial statement of the evidence and accompanied by an abstract afterward shown by an additional abstract to be

insufficient, awarded a writ of error for a review of the judgment.

The duties of Ogilvie as extra examiner and gas brusher were to enter the mine in the morning before the day shift commenced work and clear the rooms or entries of gas and examine other parts of the mine, and, after the day shift quit work at four o'clock and the shot-firers had finished their work, to again make the examination and perform the same work before the night shift would go to work at about 7:45. The mine examiners entered and left the mine by the elevator shaft, and the rooms or entries which Ogilvie was required to examine were about one and one-half miles from the bottom of the shaft. The mine was equipped with an electric tramway, on which loaded and empty coal cars were hauled to and from the bottom of the shaft. The motors were operated by electricity by means of a trolley pole running along a trolley wire at the top of the entries. In the afternoon of January 29, 1918, Ogilvie, in returning to the place where he performed his duties, passed a shot-firer, who testified that he was riding a motor and going towards the bottom of the shaft. About ten minutes later the shot-firer found Ogilvie lying in front of the motor at a place where the motor was going up-grade, his body doubled up under the front of the motor and his head lying on the south rail. The trolley was on the wire, the electric power was on and the motor was on fire. The place was about one mile from the bottom of the shaft, and the shot-firer called other shot-firers, and when the power was shut off the motor rolled back down-grade off from Ogilvie.

One disputed question related to the cause of death. The testimony of the doctor at the inquest, read into the record by agreement, was that there was no evidence of any injury outside of skin abrasions, and he had no opinion as to what was the cause of death. On the hearing on the remanding order a doctor testified that he looked at the body two or three hours after death and mortification had set in

and there was a bad odor, from which he formed an opinion that Ogilvie had been electrocuted. The basis of the opinion was that decomposition had set in so quickly, but he testified that he knew nothing about the subject nor of any medical authorities concerning it and had never examined after death a body known to have been electrocuted. He was not qualified to give any opinion on the subject, and an expert qualified by learning and experience to give an opinion testified that early decomposition was no evidence of death by electrocution. The facts proved, however, were sufficient to justify a conclusion that Ogilvie came to his death by an accident from lying in front of the motor across the track with his head forming a point of contact between the motor and rail. The motor was going up-grade, and when the power was turned off it ran back down the grade. The agency likely to cause death was present, and he was found where the deadly agency was in effectual operation and practically certain to cause death, and whether Ogilvie was electrocuted or not, the fact that there was a fatal accident is beyond question.

The principal defense was that Ogilvie was forbidden to use the motor and was killed in consequence of violating a rule of his employer. The chief clerk testified that the rules of the company were that no one should ride the motors except motormen and truck-riders; that Ogilvie was aware of the rule and had been cautioned and warned by the mine manager, and the witness did not know that it was the custom of Ogilvie to use a motor in making his examinations. H. S. Maitland, superintendent of the mine, said that he commenced work on January 26,—three days before the death of Ogilvie; that it was a rule of the company that examiners should not use motors and it did not permit any examiner to use a motor; that a day or two before the accident the motor boss complained that the motors were out of commission in the morning and suggested that they be put under lock to prevent the night shift from using them;

that on the day of the accident, in the presence of Ogilvie, the mine manager, Gilmore, in an exploration of the working, said to the witness that a certain bend would be a good place to lock the motors in, and Ogilvie asked the witness to leave one out for him, and the witness said, "We will treat everyone alike; you all look alike to me." The witness also testified that a State mine inspector's notice dated January 23, six days before the accident, had been posted at the mine containing this statement: "That no person be allowed to ride on motors except those necessary to operate trucks." This document, called a notice, was a recommendation for improvements, and for the better protection of the lives and health of the employees, recommended among other things, the matter above quoted, which was no indication that there was a rule in operation. On the part of the administratrix an extra examiner and gas brusher testified that he and Ogilvie had been buddies about eighteen months before the death of Ogilvie; that all of that time they had been using motors to do the work and the witness had been using a motor in his work for about two years; that it was the custom of the extra examiners to use the motors; that during the time he was using motors prior to the death of Ogilvie, Gilmore and Brown were mine managers and knew that the examiners were using the motors and did not forbid such use; that Gilmore was mine manager at the time Ogilvie was killed and that the witness was still employed at the same work at the time he testified, about five months after the death of Ogilvie, and had continuously used motors. A witness stated that the mine examiners were supposed to walk to their work. All the evidence was that the motors were used for the personal convenience of the mine examiners both in saving time and effort, which in the case of Ogilvie would involve walking about three miles twice each day. Whatever rule there may have been with respect to the use of the motors, it was a mere paper rule and never enforced. The extra mine ex-

aminers had been using the motors in their work for more than two years, and they continued to use them up to the time of the last hearing, on September 25, 1919, about twenty months after the death of Ogilvie, and there was evidence that there had been two mine managers since the death of Ogilvie who knew that the motors had been used and had never forbidden their use. The talk between the superintendent, Maitland, and Gilmore, the mine manager, in the presence of Ogilvie, on the same day that Ogilvie was killed, related to locking up the motors in the future, and the plan was never carried out. The reference at the time to unauthorized use of the motors was to the night shift, to which Ogilvie did not belong, but if the motors were locked up the mine examiners could not use them, and Ogilvie was told that everybody was to be treated alike. The exclusion was to take effect when the motors were locked up and might well be so regarded by Ogilvie. The plan, if finally determined on, was abandoned and the examiners continued to use the motors without objection or warning. The examiners found the motors at the bottom of the shaft, used them and left them there, and in view of the usual practice it cannot be said that Ogilvie met his death in consequence of a violation of a rule of his employer.

The respondent did not reply to the petition for a writ of error and only filed a brief and argument and additional abstract on submission of the cause for decision. Rule 43 permits the respondent to reply to the petition and file an additional abstract, if necessary. These petitions receive the consideration of the entire court, and if the petition or abstract is incorrect or incomplete the respondent should exercise the right given by the rule and give the court the benefit of a complete statement of the case, so as to prevent awarding a writ without apparently good cause.

The judgment is affirmed and the cost of the additional abstract will be taxed to the plaintiff in error.

*Judgment affirmed.*